UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VANISHA LAKE WALKER,

        Petitioner,

                                    CASE NO. 05-CV-72138-DT
v.                                        HONORABLE GERALD E. ROSEN

CLARICE STOVALL,

        Respondent.
_____/

## OPINION AND ORDER DENYING PETITION
## FOR WRIT OF HABEAS CORPUS

**I.    Introduction**

Petitioner Vanisha Lake Walker, a state prisoner presently confined at Camp Brighton in Pinckney, Michigan, has filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. Petitioner was convicted of three counts of second-degree child abuse following a jury trial in the Ingham County Circuit Court in 2002. Petitioner was sentenced as a second habitual offender to concurrent terms of three to six years imprisonment on each count. In her pleadings, Petitioner challenges the sufficiency of the evidence to support the second-degree child abuse conviction pertaining to her youngest child, Wendall Aldridge. For the reasons stated below, the petition for writ of habeas corpus is denied.

**II.    Facts and Procedural History**

Petitioner's convictions stem from the abuse of her three children, Tylesha Benson, age 7, Tyrone Benson, age 6, and Wendall Aldrich, age 3, at their home in Ingham County, Michigan. The relevant facts, initially set forth in Petitioner's brief on appeal to the state courts and accepted by the prosecution, are as follows:

1

Mr. Colin Parks of the Family Independence Agency went to the Lyons Elementary in Lansing to see Tylesha and Tyrone Benson....

According to Mr. Parks, Tylesha told him that her mother used a belt, an extension cord, or a shoe to discipline the children. She indicated that she was whupped all over her body.  A large loop mark was observed underneath her neck which appeared to relatively fresh. She also indicated that both she and her brother were locked in the basement on a regular basis as a form of punishment and sometimes made to sleep in the basement.  They were given a sheet and a blanket to lay on the floor.  In summary, she indicated that she was afraid of being locked in the basement. (6-20-02, page 93-95) (Note: Wendell Aldrich, 3, was not mentioned.)

He also talked to Tyrone.  Tyrone told him almost immediately about being whupped by his mother and being hit by his mother with a cord and with a belt and with a shoe, and that any time he saw his mother with a cord and with a belt or show or an extension cord he was afraid.  Tyrone also informed him that he had been forced to sleep overnight in the basement some time during the last two days.  And that sometimes he would be there by himself and sometimes with his sister.  The basement was dark, and he could not reach the pull cord to the only light.  (6-20-02, page 95-97) (Note: Again, Wendell Aldrich, 3, was not mentioned.)

With that information, Mr. Parks went to the children's home.  Accompanied by police officers, he entered the home and met with Ms. Walker, the Defendant.  He spoke with her.  She admitted to him that she used physical punishment, but since she had been in trouble in 1997, she knew not to leave marks.  A belt was found on a glass table in the dining room.  The door to the basement had a relatively new lock, placed approximately 4 1/2 to 5 feet from the floor, that would functionally lock someone in the basement.  On the steps to the basement was a pillow and a folded-up blanket.  The basement itself was basically empty, except for a washer and dryer, and was very cobwebby, dirty, dank.  He saw the pull cord for the light.  He did not believe that a child of 6 or 7 would be able to reach the cord.  (6-20-02, page 99-104) (Note: Wendell Aldrich, 3, was mentioned only in that he was at the home.)

On cross examination, Mr. Parks admitted that physical punishment which did not leave a mark is not illegal.  The home was clean, neat, and appeared to be suitably furnished.  Further, that Ms. Walker had indicated that the pillow and blanket were on the stairs waiting to be washed.  (6-20-02, page 109-113)

On recross, it was brought out that in 1997 she had been before the Court regarding striking Tyrone with a belt near the eye, and that she knew she could not leave marks when disciplining the children.  (6/20/02, page 115-116)

Sue Hurlburt, a foster care worker from the Child and Family Services Agency testified that she supervised the visitations of the mother with the children once

they were in foster care.

On one occasion the children were very out of control and kept running out of the visitation room. Ms. Hurlburt had to restrain the children and being them back into the room. The first thing that Tylesha said to her mother was that Tyrone doesn't love you because you whup him. Tyrone said yeah, and then he ran out of the room. Later Ms. Walker wanted to take pictures of the children. She stated that somebody lied on her and she was going to get the children back. (6/20/02, pages 119-123)

On cross-examination, it was emphasized that the children did say they wanted to go home. They never gave any impression that they were afraid of their mother. Tyrone went to his mother regularly and hugged her. Tylesha appeared to be very happy to see her. And, the Defendant never told the children what to say in court. (6/20/02, pages 124-127) (Note: Wendell Aldrich, 3, was not mentioned by name.)

After another witness testified as to the chain of evidence regarding the belt testified to by Colin Parks, videotaped testimony of Tylesha Benson was presented to the jury. This testimony had been taken as part of the preliminary examination, and was presented to the jury without objection.

Tylesha testified that she would be sent to the basement on a number of occasions when she did, or her mother thought she did, something wrong. She seemed unclear, what the length of time was that she was down there, but denied that she had ever slept there. She did note that one time she missed a meal because she was in the basement. She did state that when it was dark, there would be no light in the basement because she could not reach the pull cord. Her mom never left the house with her in the basement. (Videotape transcript: pages 40-50) She did state that there was one time that she was sent to the basement with Wendall and Tyrone. On that occasion, it was not dark, Wendall was not scared, and they all hit on the door until their mother let them out. (48-49)

Tylesha went on to testify that since she was in foster care before, her mother had been told that she could not hit them with a belt, so she was hit with her hand or a shoe. She was hit on her bottom with a shoe. It was unclear how many occasions it occurred. It could have been one time or more than one time. She also testified that she had not seen her mother whup either Tyrone or Wendall. (50-55)

She also testified about getting popped on her head with a comb. That occurred once when she was getting her hair braided. She was then told to sit still or don't scooch around. (59)

On further cross examination, she agreed that she or Tyrone or sometimes Wendall would be sent to the basement as a punishment instead of being hit. That would be for about 5 or 10 minutes. They would each be struck with a hand, or spanked. The one exception was when she was struck with a shoe. (59-65)

3

On recross, it was testified that Ms. Walker never left Wendall alone. (66)

The videotaped testimony of Tyrone was next presented to the jury.

Tyrone testified that his mother had punched him on the legs. (When is unclear). He had been made to go to the basement to be punished, sometimes with his sister. Wendall did not have to go to the basement. Tyrone had been hit with her hand, a shoe on the butt, and a belt on the back and his legs. He has also seen Tylesha get whupped with a belt, once. Wendall did not get hit by Ms. Walker. He did get hit by grandma. He denied ever having to sleep in the basement. (Times were very unclear. It does appear that some of what was testified to occurred before the children were in foster care the first time.) (Videotape transcript: pages 6-26)

Officer Bruce Holliday, testified that he had accompanied Mr. Colin Parks when he went to the Walker residence on Jan. 8, 2001. While there he asked Ms. Walker if she hit the children and was told that she did use a belt to discipline the children. He also noticed a latch on the door to the basement. It was placed about shoulder height, and would automatically latch shut when the door was closed. You had to turn a knob to open it. He also opined that the pull chain on the light was at approximately shoulder height and he did not believe a small child could reach it.

Dr. Steven R. Guertin was qualified as an expert in the area of pediatrics child abuse. (6-24-02, pages 21-22) He examined both Tylesha and Tyrone Benson on January 16, 2001, 8 days after the alleged abuse was reported. First he interviewed Tylesha Benson. She indicated that her grandmother whipped her using either a belt or a hand. Her mother would whoop her but she would use a hand not a belt. As he examined each of the children, the doctor created a body map, noting any scarring or marks that he found. On Tylesha, he found a number of marks that were indicative of abuse. There was one mark on the lower part of the back, a number of marks on the front inside aspect of the right leg, and also on the back of the leg, consistent with the statement that she had been whipped. These were "highly suspicious " of abuse. When he interviewed Tyrone, he was told that Tyrone's mother had whooped him only one time, but his grandmother uses a belt and what was described as a curtain thing where you hang up the curtain with (curtain rod). Tyrone's body map showed much more evidence of abuse. These were numerous markings on his back, legs and bottom in particular. The only issue raised was the age of the markings, which was unclear. A number of them could have come from before Ms. Walker's prior contact with the court system. (6-24-02, pages 22-43)

Finally, the Doctor spoke with and examined Wendall. Wendall did say that his mama did whoop him on the leg, face, back, neck, and foot. But, when examined, Wendall had only one mark on his body that did not indicate abuse. (6-24-02, pages 45-47) As part of the explanation for the lack of injuries to Wendall, he testified, "He may be the youngest, just, just doesn't have time to accumulate

4

injuries. He may also, up to this minute, not have suffered the same strength of force of injury, or his is perceived differently. Oftentimes in families [how] a child is perceived, will determine whether or not they will become a target if a child is compliant or obviously exhibits loving in return, sometimes that child won't necessarily get beaten very much or get beaten at all." (6-24-02, page 46)

Ms. Sharon Hobbs, a clinical psychologist, interviewed the children. During her interview with Tyrone, she was told that he was only hit one time by his mother. However, she was also told that he could not tell her the truth because he would not see his mom any more. He did say that when he was naughty, he would be sent to the basement. Both he and his sister had to sleep there. After being qualified as an expert in psychology, she testified that Tyrone is a person who has suffered from serious mental harm.

Tylesha also said that she had been spanked once when she was naughty. But generally, she would be made to go to the basement. While there, she would often fall asleep. She had a pillow and a blanket that she used on those occasions.

She also had very, very low self esteem and very, very strong dependency needs. Their seemed to be a number of reasons for this, including sexual abuse that she had suffered, which was not the subject of this case. It was also mentioned that all of the children suffered from being separated from their siblings. Tyrone was in a different foster care home from the other children.

As to Wendall, Ms. Hobbs could not learn much of anything. He was very attached to the foster mother. When he saw his brother, he became very animated and focused all of his attention on his brother. If he suffered, it appeared to be more from the separation from his brother. (6-24-02, pages 53-65)

At that point the videotape of Wendall's testimony at the time of the preliminary examination was played....

In his examination, Wendall demonstrated that he is a 3 year old. He did say that his mom told him not to say that she hit, but then related two incidents when Tyrone was whupped on his leg with a belt and on his knees. He also remembered one time when Tyrone was put in the basement. Wendall said he never had to go to the basement. (Videotaped transcript, pages 27-37)

After the videotape was played, the prosecution rested, and Vanissha Walker took the stand in her own defense.

After she got the children back in 1997 she denied using any sort of instrument on the children; belt, shoe, or cord. She would spank the children with her hand, and the butt or the leg. She would send them to the basement landing for timeouts, 10 or 20 minutes, but she never had them go down and sleep there. She did have the children over at her mother's house where the grandmother would watch them. But she did not see her mother discipline the children, and they did not complain

to her about any mistreatment.  (6-24-02, pages 84-105)

At that point, the defense rested.

*See* Petitioner's Brief on Appeal, pp. 1-9.

At the close of trial, the jury convicted Petitioner of three counts of second-degree child abuse, one for each of her children.  The trial court subsequently sentenced Petitioner to concurrent terms of three to six years imprisonment on those convictions.

Following sentencing, Petitioner filed an appeal as of right challenging the sufficiency of the evidence to support her second-degree child abuse conviction as to her youngest child, Wendall Aldridge.  The Michigan Court of Appeals affirmed Petitioner's conviction and sentence.  *People v. Walker*, No. 244219, 2004 WL 103194 (Mich. Ct. App. Jan. 22, 2004) (unpublished).  Petitioner then filed an application for leave to appeal with the Michigan Supreme Court raising the same issue, which was denied.  *People v. Walker*, 470 Mich. 888, 682 N.W.2d 96 (2004).

Petitioner thereafter filed the present petition for writ of habeas corpus raising the same sufficiency of the evidence claim presented to the state courts on direct appeal of her convictions.  Respondent has filed an answer to the petition asserting that it should be denied for lack of merit.

**III.    Standard of Review**

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, govern this case because Petitioner filed her habeas petition after the AEDPA's effective date.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless

6

>    the adjudication of the claim--
>
>    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409.

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require

citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16. While the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

Lastly, §2254(e)(1) requires that this Court presume the correctness of state court factual determinations.  28 U.S.C. § 2254(e)(1).  A habeas petitioner may rebut this presumption only with clear and convincing evidence.  *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

**IV.   Analysis**

Petitioner's sole claim upon habeas review is that the prosecution presented insufficient evidence to support her second-degree child abuse conviction as to her youngest son, Wendall Aldrich.  Respondent contends that this claim lacks merit.

In *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the United States Supreme Court established that a federal court's review of a sufficiency of the evidence claim must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The Court must view this standard through the framework of 28 U.S.C. § 2254(d).  *See Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002).  Further, the *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Jackson*, 443 U.S. at 324 n. 16.  "The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim."  *Matthews v. Abramajtys*, 319 F.3d 780, 788-89 (6th Cir. 2003) (citation omitted).

8

Under Michigan law, a person is guilty of child abuse in the second degree if any of the following apply:

> (a) The person's omission causes serious physical harm or serious mental harm to a child or if the person's reckless act causes serious physical harm to a child.
>
> (b) The person knowingly or intentionally commits an act likely to cause serious physical or mental harm to a child regardless of whether harm results.
>
> (c) The person knowingly or intentionally commits an act that is cruel to a child regardless of whether harm results.

*See* Mich. Comp. L. § 750.136b(3); *see also People v. Maynor*, 470 Mich. 289, 300, 683 N.W.2d 565 (2004) (Weaver J., concurring).  A "child" is someone "who is less than 18 years of age and is not emancipated by operation of law...." *See* Mich. Comp. L. § 750.136b(1)(a).  A "person" capable of committing child abuse of any degree is defined as a child's parent or guardian or any other person who cares for, has custody of, or has authority over a child regardless of the length of time that a child is cared for, in the custody of, or subject to the authority of that person." *See* Mich. Comp. L. § 750.136b(1)(d).

Applying the *Jackson* standard, the Michigan Court of Appeals concluded that the prosecution presented sufficient evidence to support Petitioner's second-degree child abuse conviction as to Wendall Aldridge.  The Court of Appeals stated in relevant part:

> Defendant's only argument is that there was insufficient evidence to prove the second element--committing an act or omission that was cruel or that was likely to cause serious mental or physical harm to the child regardless whether the harm actually resulted.
>
> Defendant correctly asserts that the Family Independence Agency worker, Colin Parks, made no mention, during his testimony, regarding the child.  The most that could be taken from Parks's testimony was evidence of the belt that he found in defendant's home and of the pillow and blanket on the staircase in the basement.  This evidence was circumstantial at best.
>
> Also, the testimony of Sue Hurlburt, the Child and Family services caseworker, is devoid of any mention of the child.  Hurlburt's testimony mainly focused on defendant's two older children, as well as defendant herself.  In the case of

9

Hurlburt's testimony, it is even more unclear what inferences the jury could have made regarding the alleged abuse of the youngest child.

However, the remaining witnesses' testimony provided circumstantial evidence from which the jury could have drawn reasonable inferences that the child suffered physical or mental abuse. *Allen, supra*.

Steven Guertin, M.D., a pediatric child abuse expert, admitted that there was not the same amount or type of evidence of abuse regarding the youngest child as there was of the two older children. However, the doctor also clearly stated that this did not mean that the child had never been abused. Dr. Guertin also admitted that when he interviewed him, the child related that defendant had struck him in the back, neck, and foot. The jury could have inferred from Dr. Guertin's testimony that physical evidence did not result from all cases of child abuse.

The strongest testimony for the prosecution came from the child's older sister. The sister stated that both her younger brothers had been hit with a hand or a shoe and locked in the basement. The girl also related a story when she and her two brothers were all locked in the basement and had been banging on the door until defendant finally let them out. [FN1] The jury could have found the girl to be the most credible of defendant's children, not just because of her age, but also because of her detailed testimony. [FN2] The jurors could have based their belief that the youngest boy was locked in the basement or hit by defendant on the girl's testimony alone. Although it appears from the record that she was somewhat inconsistent in her testimony regarding certain matters, it is this Court's duty "not [to] interfere with the jury's role of determining the weight of the evidence or the credibility of witnesses." *Wolfe, supra* at 514.

    FN1. In conjunction with this testimony, Dr. Sharon Hobbs testified that being locked in a dark basement was problematic for these children.

    FN2. Indeed, evidence existed which would have allowed the jury to disbelieve the testimony of both the child and his older brother that the child had never been struck.

When reviewing a claim of insufficient evidence, the "standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Therefore, we find it probable that the jury found the girl's and Dr. Guertin's testimony most credible. Furthermore, the jury could have inferred from Dr. Hobbs' testimony that being locked in the basement, in the manner that these children were, was sufficient to constitute severe mental distress. These inferences, when viewed in the light most favorable to the prosecution, were sufficient to support the jury's finding that defendant was guilty of second-degree child abuse beyond a reasonable doubt.

*Walker*, 2004 WL 103194 at *1-2.

Having reviewed the record, this Court concludes that the Michigan Court of Appeals' decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts in light of the evidence. As discussed by the Michigan Court of Appeals, Tylesha Benson's testimony, combined with that of Dr. Guertin and Dr. Hobbs, provides sufficient evidence to support Petitioner's conviction for second-degree child abuse as to Wendall Aldrich. Tylesha Benson's testimony, and Wendall Aldrich's statements to Dr. Guertin, established that Petitioner had struck Wendall Aldrich with a hand or shoe and had locked him in a darkened basement. Additionally, the expert testimony provided evidence to support a finding of mental anguish and distress.

Petitioner's insufficient evidence claim challenges the credibility and weight to be accorded the evidence presented at trial. However, it is well-settled that "[a] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir. 1983). It is the job of the jury, not a federal habeas court, to resolve evidentiary conflicts. *See Jackson*, 443 U.S. at 326; *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). Given the evidence presented at trial, this Court finds that the Michigan Court of Appeals' determination that a rational trier of fact could have found the elements of second-degree child abuse as to Wendall Aldrich beyond a reasonable doubt was reasonable. Habeas relief is not warranted on this claim.

**V.    Conclusion**

For the reasons stated, this Court concludes that Petitioner is not entitled to federal habeas relief on the claim presented in her petition.

11

Accordingly,

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED** and

**DISMISSED WITH PREJUDICE**.



                                             s/Gerald E. Rosen
                                             Gerald E. Rosen
                                             United States District Judge

Dated: June 30, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 30, 2006, by electronic and/or ordinary mail.

                                             s/LaShawn R. Saulsberry
                                             Case Manager